## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ANGELA P.,**[1]<br><br>            **Plaintiff,**<br><br>    **v.**<br><br>**FRANK J. BISIGNANO,**[2]<br>**Commissioner of Social Security,**<br><br>            **Defendant.** | **Case No. 24-cv-827 (GMH)** |

## <u>MEMORANDUM OPINION</u>

Plaintiff Angela P. seeks to reverse the final decision of the Commissioner of Social Security ("Defendant" or "Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 405(g), 1382(c)(3). Plaintiff alleges that the Administrative Law Judge ("ALJ") erred in several respects when determining that Plaintiff had the residual functional capacity ("RFC") to perform light work with some additional limitations. More specifically, Plaintiff contends that the ALJ (1) failed to properly evaluate Plaintiff's allegations of mental impairments, (2) failed to properly evaluate the medical opinions of two medical providers, and (3) failed to incorporate assessed limitations into her RFC. Plaintiff seeks

---

[1] Plaintiff's name has been partially redacted in accordance with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt. to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf [https://perma.cc/N9T2-U5XG].

[2] The current Commissioner of Social Security is substituted as Defendant under Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d).

reversal of the Commissioner's decision and a judgment that she is entitled to benefits, or in the alternative, remand for a new administrative hearing.

Based on the parties' arguments and review of the record,[3] the Court agrees with Plaintiff that the ALJ did not properly account for her limitations in concentration, persistence, and pace ("CPP") in the assessment of her RFC.  Plaintiff's other arguments, however, are unavailing. Accordingly, her motion for judgment of reversal is granted to the extent it requests remand to the Commissioner for further administrative proceedings, and Defendant's motion for judgment of affirmance is denied.

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework

To be eligible for SSI benefits under the Social Security Act, the Social Security Administration must find a claimant to be "disabled," meaning that the individual is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  To make that determination, an ALJ gathers evidence, holds a hearing, takes testimony, and performs the following five-step, sequential inquiry of the disability claim:

Step one:  whether the claimant is engaging in "substantial gainful activity."[4]  If

---

[3] The relevant docket entries for purposes of this Memorandum Opinion are (1) the administrative record, ECF No. 7; (2) Plaintiff's motion for judgment of reversal, ECF No. 9; (3) Defendant's motion for judgment of affirmance and opposition to Plaintiff's motion for judgment of reversal, ECF No. 15; and (4) Plaintiff's response to defendant's motion for judgment of affirmance, ECF No. 17.

[4] "Substantial gainful activity" is work that "involves doing significant and productive physical or mental duties" and is "done (or intended) for pay or profit."  20 C.F.R. § 416.910; *see also* 20 C.F.R. § 404.1510 (defining "substantial gainful activity" for the purposes of Social Security disability insurance benefits ("DIB") claims).  "If [the claimant is] doing substantial gainful activity, [the Social Security Administration ("SSA")] will find that [the claimant is] not disabled."  20 C.F.R. § 416.920(a)(4)(i); *see also* 20 C.F.R. § 404.1520(a)(4)(i) (defining the step one inquiry for DIB claims).

the answer is yes, then the claimant is not disabled.

Step two: whether the claimant has a "severe" medically determinable physical or mental impairment or combination of impairments.[5] If the answer is no, the claimant is not disabled.

Step three: whether the claimant's impairment is equivalent to one of the disabling impairments listed in the appendix of the relevant regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If the answer is yes, the claimant is disabled.

Step four: whether the impairment prevents the claimant from performing his or her past relevant work.[6] If the answer is no, the claimant is not disabled.

Step five: whether the claimant, in light of his or her age, education, work experience, and RFC—i.e., the most he or she is able to do notwithstanding his or her physical and mental limitations—can still perform another job available in the national economy.[7] If the answer is yes, the claimant is disabled.

*See* 20 C.F.R. § 416.920; *see also id.* § 404.1520; *Butler v. Barnhart*, 353 F.3d 992, 997

(D.C. Cir. 2004); *Hines v. Bowen*, 872 F.2d 56, 58 (4th Cir. 1989).

---

[5] An impairment or combination of impairments is "severe" if it "significantly limit[s]" a claimant's "physical or mental ability to do basic work activities," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "seeing, hearing, [or] speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; exercising judgment; "[r]esponding appropriately to supervision, co-workers[,] and usual work situations"; or "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.922; *see also* 20 C.F.R. § 404.1522 (defining a severe impairment for the purposes of DIB claims).

[6] "Past relevant work" is work "done within the past 15 years that was substantial gainful activity and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 416.960(b)(1)(i) (amended 2024); *see also id.* § 404.1560(b)(1)(i) (amended 2024) (defining "past relevant work" for the purposes of DIB claims). If the claimant can perform his or her past relevant work, a finding of "not disabled" is required. *Id.* § 416.920(a)(4)(iv); *see also id.* § 404.1520(a)(4)(iv) (defining the step four inquiry for DIB claims). On June 24, 2024, the definition of "past relevant work" changed to work "done within the past five years that was substantial gainful activity and that lasted long enough for [the claimant] to learn to do it" and that was not "started and stopped it in fewer than 30 calendar days." *Id.* § 416.960(b)(1) (emphasis added); *see id.* § 404.1560(b)(1) (defining "past relevant work" for the purposes of DIB claims); 89 Fed. Reg. 27,653 (Apr. 18, 2024) (outlining amendment to definition of "past relevant work"); 89 Fed. Reg. 48,138 (Jun. 5, 2024) (deferring effective date of amendment to June 24, 2024). Because it was in effect at the time of the ALJ's decision, the fifteen-year lookback period applies in this matter. *See Gregory G. v. Bisignano*, No. 23-cv-2439, 2025 WL 1824842, at *13–15 (D.D.C. July 2, 2025).

[7] At the fifth step, the ALJ may, "'[i]n the ordinary case, . . . resort[ ] to the applicable medical vocational guidelines'" (also known as "the grids") to determine whether the claimant is disabled. *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2. "The grids 'take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.'" *Id.* (alteration in original) (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996)). However, when a claimant has additional limitations beyond those contemplated by the grids, the ALJ cannot rely on the grids alone to establish non-disability. *Id.* In such cases, the testimony of a vocational expert is generally required. *Smith v. Bowen*, 826 F.2d 1120, 1122 (D.C. Cir. 1987).

The claimant bears the burden of proof at the first four steps of the evaluation. *Callahan v. Astrue*, 786 F. Supp. 2d 87, 89 (D.D.C. 2011). At step five, the burden shifts to the Commissioner to identify specific jobs available in the national economy that the claimant can perform. *Id.* In making this determination, an ALJ may call a vocational expert to testify at the hearing as to whether, based on the claimant's RFC, he or she can perform other work that exists in the national economy. *Id.* at 90.

### B.      Plaintiff's Disability Claims and Procedural History

Plaintiff was born in September 1969. ECF No. 7-2 at 37. She is a high school graduate and completed two years of college but did not obtain an associate's degree. *Id.* at 52. Plaintiff last worked as a restaurant cook until March 2020, when she was let go for reasons unrelated to her health. ECF No. 7-6 at 3.

Plaintiff applied for SSI and DIB benefits on May 26, 2020. *Id.* at 28. In that application, she claimed disability with an onset date of May 6, 2020, due to joint pain, high blood pressure, and HIV infection. *Id.* Plaintiff's application was denied at the initial level of review on August 14, 2020, and denied upon reconsideration on March 4, 2022. ECF No. 7-2 at 28. She thereafter requested a hearing before an ALJ. *Id.*

On May 5, 2023, the ALJ held a hearing via telephone. *Id.* At the hearing, the ALJ heard testimony from Plaintiff and a vocational expert ("VE"). Plaintiff testified that she has pain in her hip area, unintentional weight loss of about 50–60 pounds, rotator cuff pain, and a swollen thyroid. *Id.* at 58–59. She also testified to pain in her chest, ankles, back of head, lower back, and neck. *Id.* at 63–64, 67. Plaintiff also experienced pain from falls that occurred in May and December 2022. *Id.* at 62. In December 2022, she fell and hit the left side of her body on her bathtub while she was attempting to remove mold from her bathroom ceiling. *Id.* Plaintiff testified that a similar

incident occurred in May 2022, when she was removing mold from her ceiling, fell, and hit the other side of her body. *Id.* Plaintiff testified she suffers from other health issues, including HIV and vision difficulties. *Id.* at 69–71.

Regarding her mental health, Plaintiff testified that she has anxiety and a family history of schizoaffective disorder. *Id.* at 75. She stated that her mental health was adversely affected by concerns about her housing, specifically the presence of mold and scabies in her apartment. *Id.* at 60–61, 77. She believes these worries have contributed to her anxiety, trouble sleeping, and unintentional weight loss. *Id.* at 77, 79. Plaintiff also answered questions regarding cognition and social connections. *Id.* at 80. When asked if she has difficulty concentrating or working on a task until it is completed, Plaintiff testified that she can get "irritated." *Id.* She testified that she has no social connections. *Id.* at 81.

A VE also testified at the hearing, classifying Plaintiff's past work and answering a series of hypothetical questions about jobs available in the national economy for someone with her physical and mental limitations. *Id.* at 88–92. With respect to Plaintiff's past work, the VE testified that her work as a security guard had a Specific Vocational Preparation ("SVP")[8] of three, and her job as a grill cook had an SVP of 7. *Id.* at 89. The ALJ then proposed a hypothetical individual with the Plaintiff's age and education who could perform light work limited to SVP 1 or SVP 2 with the following additional limitations:

- Frequently climbing ramps and stairs
- Occasionally climbing ladders, ropes, or scaffolds
- Frequently balancing, stooping, crouching, kneeling, and crawling
- Avoiding greater than occasional exposure to pulmonary irritants
- Having no exposure to hazards
- Performing simple, routine tasks, and simple work-related decisions

---

[8] "SVP" is a term "used within the DOT to define the time generally required to learn certain skills for particular jobs." *Tiana O. v. Kijakazi*, No. 20-cv-2051, 2023 WL 5348747, at *13 n.13 (D.D.C. Aug. 21, 2023). An SVP of 1–2 corresponds to unskilled work, 3–4 corresponds to semi-skilled work, and 5–9 corresponds to skilled work. *See id.*

- Having frequent interaction with supervisors, co-workers, and the public
- Tolerating few changes to work processes and settings.

*Id.* at 89–90.  The VE testified that, although a person with these limitations could not perform Plaintiff's past work, there would be other jobs available to them in the economy, including tanning salon attendant, furniture rental consultant, and retail marker.  *Id.* at 90–91.

On cross examination, Plaintiff's attorney asked the VE whether a person having less than an occasional ability to pursue a work-related task could find employment in the national economy. *Id.* at 91.  The VE testified that no jobs would be available because such a person would be off task more than ten percent of the time.  *Id.*

## C.    The ALJ's Decision

The ALJ's  decision denying Plaintiff benefits engaged in the standard five-step sequential inquiry as outlined below.

### 1.    *Substantial Gainful Employment, Severe Impairments, and the Listings*

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability on May 6, 2020.  *Id.* at 30.  At step two, the ALJ determined that Plaintiff had the following severe impairments: hypertension, thyroid disorder, sciatica, anxiety disorder, depressive disorder, and PTSD.  *Id.*  The ALJ found that her other ailments—HIV and retinopathy—do not significantly limit her ability to perform basic work.[9]  *Id.* at 31.  At step three, the ALJ concluded that Plaintiff's impairments did not meet or medically equal the severity of any of the impairments in the Listings.  *Id.* at 31.  Specifically, he found that her physical ailments did not meet the requirements of Section 1.00 of the Listings, which concerns musculoskeletal disorders.  *Id.*  As for psychological impairments, the ALJ assessed Plaintiff with

---

[9] Plaintiff takes medication for her HIV and is asymptomatic.  *Id.*  Plaintiff also does not wear contact lenses or glasses for any vision problems and denies blurred vision.  *Id.*

moderate limitations in all areas of mental functioning—understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace ("CPP"); and adapting and managing oneself.  *Id.* at 31–32.

2.      *Plaintiff's RFC*

Prior to step 4, the ALJ found that Plaintiff had the RFC to perform "light work"[10] except that she was limited to:

- Frequently climbing ramps and stairs
- Occasionally climbing ladders, ropes, or scaffolds
- Frequently balancing, stooping, crouching, kneeling, and crawling
- Avoiding greater than occasional exposure to pulmonary irritants
- Having no exposure to hazards
- Performing simple, routine tasks, and simple work-related decisions
- Having frequent interaction with supervisors, co-workers, and the public
- Tolerating few changes to work processes and settings.

*Id.* at 33.

In determining the RFC, the ALJ first found that Plaintiff's medically determinable ailments of hypertension, thyroid disorder, sciatica, anxiety, depressive disorder, and PTSD "could reasonably be expected to cause the alleged symptoms." *Id.* at 34.      However, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effect of those symptoms, both mental and physical, were not "entirely consistent" with the medical and other evidence in the record. *Id.*

As to her physical ailments, Plaintiff reported pain in her arms, thighs, hips, buttocks, feet, ankles, back, and shoulders, and when squatting, bending, and standing. *Id.* Because of the pain,

---

[10] The regulations define "light work" as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).  SSR 83-10 further explains that "the full range of light work requires standing or walking, off and on, for . . . approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251, at *5–6 (S.S.A. Jan. 1, 1983).

she reported that she needed extra time to perform personal care tasks and could walk for only 30 minutes before needing to rest for ten minutes. *Id*. Regarding her mental health symptoms, Plaintiff stated that she was easily distracted and struggled with concentration and following instructions; had difficulty handling stress, including from changes in routine; had difficulty sleeping; was often emotional and tearful; and had no social support. *Id.*

The ALJ considered the findings of multiple deformities of Plaintiff's vertebrae, abnormal blood pressure, and abnormal thyroid levels, but noted her physical examinations showed "only some occasional outpatient treatment for her musculoskeletal pain and fatigue dating back to 2019, including prescription medication." *Id.* at 34. In addition, the ALJ observed that while Plaintiff had some limitations in her physical abilities, such as a limited range of motion in the lumbar spine and partial range of motion in the wrist and fingers, physical examinations showed that she had a normal gait, no need for assistance in getting on or off the examination table, a full range of motion in her cervical spine, shoulders, knees, and ankles, and intact dexterity. *Id.* at 35.

Addressing Plaintiff's mental health symptoms, the ALJ noted that she regularly reported symptoms including post-traumatic stress, victimization, anxiety, irritability, and excessive worry to her treating physicians. *Id.* However, the ALJ noted that Plaintiff failed to follow up on recommendations to meet with a mental health practitioner. *Id.* She sometimes presented with "restless movements, fast speech, and difficulty staying on topic, but she was also noted to be easily redirectable and was able to address specific questions with reminders." *Id.* Overall, the ALJ noted that Plaintiff had "not followed through with recommendations for mental health treatment" or "undergone any inpatient hospitalization or emergency room treatment for her mental or physical symptoms," and that her "diagnostic studies have been generally normal, and [her] physical and mental examinations do not support the level of limitation alleged." *Id.* at 34.

The ALJ then reviewed the medical opinions in the record, including those of Dr. Colon, who prepared a report in August 2023 after performing a consultative psychiatric examination of Plaintiff; Dr. Carlson, a colleague of Plaintiff's primary care physician, who completed a physical impairment questionnaire and a mental impairment questionnaire on Plaintiff's behalf in April 2023; and Nurse Ware, who prepared a report in July 2023 after performing a consultative physical examination of Plaintiff. *See* ECF No. 7-9 at 55–63, 119–29, 135–42. In doing so, the ALJ expressly noted that she could not "defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources." ECF No. 7-2 at 35.

Dr. Colon opined that Plaintiff had moderate limitations in her "ability to interact adequately with supervisors, co-workers, and the public[;] sustain concentration and perform a task at a consistent pace[;] and regulate emotions, control behavior, and maintain wellbeing." He further found that she had mild limitations in her "ability to understand, remember, and apply complex directions and instructions[;] use reasoning and judgment to make work-related decisions,[;] and sustain an ordinary routine and regular attendance at work"; and no limitations in her "ability to understand, remember, and apply simple directions and instructions [and] maintain personal hygiene and appropriate attire" or in her "awareness of normal hazards and taking appropriate precautions." The ALJ found Dr. Colon's reasoning largely persuasive because it was supported by his own examination of Plaintiff and consistent with her progress notes. She appears to have adopted his findings as to interacting with others and adapting and managing oneself, assessing Plaintiff with moderate limitations in those areas of functioning. *Id.* at 31–32. Regarding the remaining two limitations—CPP and understanding, remembering, and applying information—the ALJ adopted more restrictive limitations than those recommended by Dr. Colon,

finding that she had moderate rather than mild restrictions in these domains. *See id.* at 31–32.

Conversely, the ALJ did not find persuasive the opinions of Dr. Carlson or Nurse Ware. In her April 2023 questionnaires, Dr. Carlson opined (among other things) that Plaintiff would need to recline; had limited ability to stand and walk; required unscheduled breaks; was unable to work an eight-hour day, five days a week job on a sustained basis; would be absent from work four or more times per month; had extreme limitations in her ability maintain socially appropriate behavior; and had marked limitations in her ability to work in coordination or proximity to others without being distracted by them, perform at a consistent pace, interact appropriately with the general public, accept instructions and respond appropriately to criticism, respond appropriately to changes in the work setting, and travel in unfamiliar places. *Id.* at 35. Noting that Dr. Carlson was merely "a colleague of the claimant's primary care physician and had reviewed her treatment notes and met with the claimant starting only that same month," the ALJ rejected those severe restrictions because they were unsupported by Plaintiff's progress notes and inconsistent with the facts that she had not required any emergency room visits or in-patient hospitalizations and she had "not followed through with recommendations for mental health treatment." *Id.* at 35. Similarly, he found unpersuasive Nurse Ware's opinion that Plaintiff had "extreme" physical limitations—such as an ability to perform only sedentary work and strict constraints on sitting, standing, walking, reaching, climbing, and exposure to environmental hazards—because it was "inconsistent with the medical evidence of record, which  "does not show any medically determinable impairment that would support such extreme limitations." *Id.* at 36.

In sum, the ALJ found that many of Plaintiff's claimed physical and mental limitations had some support in the record but resolved conflicting evidence in favor of moderate limitations rather than the more severe limitations claimed by Plaintiff, Dr. Carlson, and Nurse Ware.

### 3.    Conclusion of the Five-Step Sequential Inquiry

Relying on the testimony from the VE, the ALJ determined that an individual with Plaintiff's RFC would be able to perform the occupations of tanning salon attendant, furniture rental consultant, and retail marker.  *Id.* at 37–38.  Accordingly, the ALJ found Plaintiff not disabled.

## II.    LEGAL STANDARD

A federal district court has jurisdiction over a civil case challenging a final decision of the Commissioner.  42 U.S.C. § 405(g).  A reviewing court must affirm the Commissioner's decision if it is based on substantial evidence in the record and the correct application of the relevant legal standards.  *Id.*; *Butler*, 353 F.3d at 999.

"[T]he plaintiff bears the burden of demonstrating that the Commissioner's decision is not based on substantial evidence or that incorrect legal standards were applied."  *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 64 (D.D.C. 2006).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It requires "more than a scintilla [of evidence], but can be satisfied by something less than a preponderance of the evidence."  *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003) (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d1151, 1160 (D.C. Cir 2002)).  "The substantial evidence standard requires considerable deference to the decision rendered by the ALJ."  *Crosson v. Shalala*, 907 F. Supp. 1, 3 (D.D.C. 1995).

The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own."  *Id.* at 3; *see also Butler*, 353 F.3d at 999 (finding that the district court's role is not to reweigh the evidence but

only to determine whether the ALJ's findings are "based on substantial evidence and a correct application of the law"). However, "this standard of review requires the Court to carefully scrutinize the entire record to ensure that the Commissioner, through the ALJ, has both analyzed all of the evidence available and has sufficiently explained his/her reasoning and the weights given to the facts." *Pinkney v. Astrue*, 675 F. Supp. 2d 9, 14 (D.D.C. 2009); *see also Lane-Rauth*, 437 F. Supp. 2d at 65 ("[T]his standard of review 'calls for careful scrutiny of the entire record,' to determine whether the Commissioner, acting through the ALJ, 'has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits[.]'" (second alteration in original) (quoting *Butler*, 353 F.3d at 999)).

Moreover, the Court's job is to "consider the grounds actually proffered by the ALJ" rather than to make those determinations for itself, *Ward v. Berryhill*, 246 F. Supp. 3d 202, 210 (D.D.C. 2017), or credit "post-hoc rationalization[s]" advanced by the parties, *Cooper v. Berryhill*, No. 16-cv-1671, 2017 WL 4326388, at *5 (D.D.C. Sept. 28, 2017). *See also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a reviewing court "must judge the propriety of [an agency's judgment] solely by the grounds invoked by the agency"); *Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) (citing *Chenery*, 332 U.S. at 196).

## III.    DISCUSSION

Plaintiff mounts a multipronged attack on the RFC set by the ALJ. First, she contends that the ALJ improperly discounted her own testimony regarding the intensity and persistence of her symptoms. Second, she claims that the ALJ erred by rejecting the more severe limitations recommended by Dr. Carlson and Nurse Ware. And third, she argues that the ALJ did not properly account for Plaintiff's CPP limitations within the RFC assessment. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed. *See* ECF No.

15 at 31. The Court concludes that the second prong of Plaintiff's challenge has merit but finds that the ALJ's opinion is otherwise supported by substantial evidence.

### A.    The Intensity and Persistence of Plaintiff's Symptoms

Plaintiff claims that the ALJ improperly discounted Plaintiff's own testimony regarding the intensity and persistence of her symptoms. Social Security Ruling 16-3p sets forth guidance on how ALJs must consider a claimant's "symptoms," which are "the individual's own description or statement of his or her physical or mental impairment(s)." SSR 16-3p, 2016 WL 1119029, at *2 (S.S.A. Mar. 16, 2016). There are two steps to the SSR 16-3p analysis. First, the ALJ must determine whether a "medically determinable impairment" exists that could cause the claimant's symptoms. *Id.* at *3. Next, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects" of those symptoms. *Id.* at *2. Plaintiff's argument relates to the ALJ's decision to discount Plaintiff's own testimony at the second step of the inquiry.

The credibility determination that takes place within the second step is "solely within the realm of the ALJ." *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012). However, if the "ALJ fails to articulate a rational explanation for his or her finding," a reviewing court may intercede. *Id.* The D.C. Circuit has found that an ALJ may articulate a rational explanation by issuing a decision that "contain[s] specific reasons for [a] finding on credibility, supported by the evidence in the case record, and [is] sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Butler*, 353 F.3d at 1005 (quoting SSR 96-7p, 1996 WL 374186, at *2); *see, e.g.*, *Willis v. Comm'r of Soc. Sec.*, No. 24-CV-1503, 2025 WL 2055270 at *23 (N.D. Ohio July 23, 2025) (upholding the ALJ's determination of 16-3p symptoms when the ALJ "clearly articulated how he considered the evidence of record in making his findings and made a determination that

was supported by substantial evidence"), *report and recommendation adopted*, 2025 WL 2402706 (N.D. Ohio Aug. 19, 2025).   This Court has thus emphasized that the ALJ, as the fact finder, "has great discretion in evaluating a claimant's testimony and is generally entitled to deference." *Demetria R. v. Kijakazi*, No. 20-cv-3227, 2022 WL 3142376, at *10 (D.D.C. June 30, 2022), *report and recommendation adopted*, 2022 WL 3139026 (D.D.C. Aug. 5, 2022).

"In evaluating the intensity and persistence of symptoms, the ALJ should consider such factors as the objective medical evidence, medical opinions, daily activities, type of pain/symptoms, precipitating and aggravating factors, medication and other treatment, any other measures used to relieve symptoms, and any other factors concerning functional limitations." *Id.* at *9.  It is well established that an ALJ "may consider 'whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence,'" *McCormick v. Saul*, No. 18-cv-1704, 2021 WL 2634732, at *9 (D.D.C. June 25, 2021) (alteration in original) (quoting *Butler*, 353 F.3d at 1004–05), including whether the claimant failed to seek recommended treatment, *see Goodman v. Saul*, 233 F. Supp. 3d 88, 108 (D.D.C. 2017).  In particular, an ALJ may consider whether a claimant has followed their prescribed treatment plan and may find that the failure to do so undercuts a claimant's testimony regarding the intensity of his or her symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *8 ("We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities[.]").

The ALJ found that Plaintiff's statements about the intensity and persistence of her symptoms were inconsistent with other evidence in the record, and therefore discounted them. ECF No. 7-2 at 33–37.  Specifically, as relevant here, the ALJ relied on the fact that that her

14

"diagnostic studies have been generally normal" and that "she has not followed through with recommendations for mental health treatment." *Id.* at 34. Plaintiff challenges both findings. First, Plaintiff contends that the ALJ erred in rejecting Plaintiff's "allegations of mental dysfunction" by ignoring "abnormal mental status results" that support Plaintiff's own testimony. ECF No. 9 at 23. Second, Plaintiff argues that the ALJ erred by relying on "the fact that she failed to follow-up on her treatment provider's recommendation to pursue mental health treatment" to discount her claims about the severity of her symptoms. *Id.*; *see also* ECF No. 17 at 7. Neither argument is persuasive.

First, the ALJ did not ignore evidence of Plaintiff's abnormal mental status. For example, the ALJ recognized that Plaintiff's doctors reported that she showed "restless movements, fast speech, and difficulty staying on topic"; "mildly impaired attention and concentration, borderline intellectual functioning, somewhat limited fund of information, and fair insight and judgment"; "'mild' limitations in her ability to understand, remember, and apply complex directions and instructions, and use reasoning and judgment to make work-related decisions"; that Plaintiff reported "dysphoric moods, loss of energy, excessive crying, irritability, social withdrawal, loss of interest, flashbacks, nightmares, hypervigilance, avoidance, and occasional auditory hallucinations"; that a mental status examination showed "tearfulness, anxious appearance, depressed mood, fair manner of relating, and fair insight and judgment"; and that Plaintiff regularly reported mental health symptoms to her treating physicians, "including symptoms of post-traumatic stress, victimization, anxiety, irritability, excessive worry, fear of environmental exposure, and problems getting along with others." ECF No 7-2 at 31–35. But the ALJ also relied on other evidence that is inconsistent with that evidence. For example, the ALJ noted that Plaintiff was also "easily redirectable and was able to address specific questions with reminders" and that she was able to perform daily activities. *Id.* at 31–33, 35. Similarly, the ALJ observed that Plaintiff

had "intact orientation, normal thoughts, adequate speech, normal motor behavior, and appropriate eye contact." *Id.* at 31–33. In short, the ALJ considered all the evidence, including the evidence that supported and undercut Plaintiff's reports of the intensity and persistence of her symptoms, and concluded that it supported "moderate" limitations.

Second, the ALJ did not err by considering Plaintiff's failure to follow-up on recommended treatment. SSA regulations provide that an ALJ can consider "noncompliance" as one factor in analyzing a complainant's credibility. *See* SSR 16-3p, 2016 WL 1119029, at *8 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."); *see also Vega v. Comm'r of Soc. Sec.*, 358 F. App'x 372, 375 (3d Cir. 2009) (stating that it is "not improper" for the ALJ to consider the claimant less credible if the claimant fails to follow a treatment plan without good reason); *Kenneth W. v. Comm'r of Soc. Sec.*, No. 19-CV-0825, 2020 WL 7385251 at *7 (W.D.N.Y. Dec. 16, 2020) (finding that the ALJ properly considered the plaintiff's non-compliance with mental health treatment and medications when determining the alleged intensity and persistence of plaintiff's symptoms); *Diaz-Sanchez v. Berryhill*, 295 F. Supp. 3d 302, 306 (W.D.N.Y. 2018) (finding that the ALJ properly construed the plaintiff's inaction in receiving treatment for an allegedly disabling mental health condition as evidence that the condition was not seriously limiting).

Plaintiff claims that the ALJ failed to inquire about or "consider whether Plaintiff had reasons for not pursuing" the treatment recommended by her doctors. ECF No. 9 at 23. This Court has recognized that when determining the claimant's credibility, "the ALJ should . . . 'review the case record to determine whether there are explanations' for a claimant's failure to follow

treatment." *Darlene M. v. Kijakazi*, No. 20-cv-1817, 2021 WL 6841641, at *23 (D.D.C. Sep. 3, 2021) (quoting SSR 16-3p, 2017 WL 5180304, at *10), *report and recommendation adopted sub nom. Darlene M. v. O'Malley*, 2024 WL 2813317 (D.D.C. June 3, 2024).  That is because a sufficient explanation for the claimant's noncompliance, such as that the claimant cannot afford the treatment, can negate the inference that the claimant's symptoms are not as severe as claimed. *See Michael C. v. Kijakazi*, 18-cv-1935, 2022 WL 2305735, at *8 (D.D.C. Mar. 5, 2022).

However, this Court has rejected the contention that the ALJ must "engag[e] in 'detailed questioning' of the claimant to ascertain the reason(s) for failing to follow the prescribed treatment." *Darlene M.*, 2021 WL 6841641, at *22 (quoting SSR 82-59, 1982 WL 31384, at *2)). To be sure, there are situations in which such an inquiry must occur—it is required "where the ALJ concludes that a claimant is disabled and must thereafter determine whether the noncompliance should block her entitlement to benefits." *Id.* (collecting cases).  But this is not such a situation. More, this Court and others have found that an ALJ's failure to consider reasons a claimant did not engage in recommended treatment may be cause for a remand where that "noncompliance [is] the only thing barring relief," but not where that noncompliance is "'merely . . . a factor' in their decision." *Dennison v. O'Malley*, No. 24-cv-2301, 2025 WL 2450674, at *4 (D.D.C. Aug. 26, 2025) (quoting *Darlene M.*, 2021 WL 6841641, at *23).  Here, as noted above, the ALJ also pointed to medical evidence inconsistent with Plaintiff's claims of disabling symptoms.  Put another way, "the ALJ's credibility determination regarding Plaintiff's statements about her impairments, given their inconsistencies with various medical records, is supported by [substantial] evidence." *Troy v. Colvin*, No. 15-cv-916, 2016 WL 9390632, at *5 (D.D.C. Aug. 25, 2016), *report and recommendation adopted*, 266 F. Supp. 3d 288 (D.D.C. 2017); *cf. Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) ("[E]ven if an ALJ's adverse credibility determination is

based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it.").

Finally, even assuming that the ALJ erred by not considering Plaintiff's explanation, it made no difference in the outcome. *See Katrina M. v. O'Malley*, 752 F. Supp. 3d 1, 11 (D.D.C. 2024) ("For an ALJ's error to warrant reversal or remand, the plaintiff must demonstrate that the error was prejudicial and affected the disposition of the claim."). Plaintiff's briefs nowhere provide an explanation for her noncompliance. *See* ECF No. 9 at 23; ECF No. 17 at 7. And the only reason the Court can find in the record is Plaintiff's statement to Dr. Carlson that she "want[ed] to wait until other acute issues [were] handled." ECF No. 7-9 at 8. In other words, Plaintiff's own explanation for her noncompliance is that her mental symptoms were not so severe that they required immediate treatment. Unlike, for instance, an "inability to afford treatment," *Michael C.*, 2022 WL 2865976 at *8, Plaintiff's explanation does nothing to negate the inference that her symptoms were not as severe as she claimed—indeed, if anything, it further supports that conclusion. So there is no need to remand, even assuming error, because the ALJ would reach the same result after considering Plaintiff's explanation for her noncompliance.

### B.    The ALJ's Evaluation of Medical Opinions

Plaintiff next challenges the ALJ's rejection of Dr. Carlson's and Nurse Ware's medical opinions. As explained below, neither of those challenges has merit.

#### 1.    Dr. Carlson

Dr. Carlson assessed more severe physical and mental limitations than the ALJ ultimately adopted, finding that Plaintiff had an "extreme limitation" in her ability to complete a normal workday and workweek, would struggle to maintain socially appropriate behavior, and would likely have four or more absences from work per month. ECF No. 7-2 at 35. Dr. Carlson opined

that Plaintiff "would need to recline" and "had a limited ability to stand and walk." *Id.* Dr. Carlson also found that Plaintiff had a marked limitation in her ability "to work in coordination or proximity to others without being distracted by them, perform at a consistent pace, interact appropriately with the general public, accept instructions and respond appropriately to criticism, respond appropriately to changes in the work setting, and travel in unfamiliar places." *Id.* The ALJ ultimately rejected Dr. Carlson's opinion as "unpersuasive" given Dr. Carlson's limited observation of Plaintiff and Dr. Carlson's opinion's inconsistency with other evidence in the record. *Id.* For a variety of reasons, Plaintiff claims that the ALJ should have adopted Dr. Carlson's opinion and that the ALJ's refusal to do so is not supported by substantial evidence. The Court, however, concludes that substantial evidence supports the ALJ's rejection of Dr. Carlson's opinion.

The opinion of a medical professional who has treated a claimant can be persuasive evidence of a claimant's condition. But an ALJ is not obligated to defer to any medical professional. SSA regulations governing claims filed, like this one, after March 27, 2017, provide that an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion," including an opinion from a medical source who has treated the claimant. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, medical opinions are evaluated based on (1) the supportability of the opinion (that is, the "objective medical evidence and supporting explanations presented by [the] medical source to support his or her medical opinion []") and (2) the consistency of the opinion with other evidence in the record. *Id.* at §§ 404.1520c(b)(2), (c)(1)–(2), 416.920c(b)(2), (c)(1)–(2). An ALJ may also consider the medical source's relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the kinds and extent of examinations and testing performed, and whether the medical source examined the claimant or merely reviewed evidence; the

specialization of the medical source; and "[o]ther factors" such as the medical source's familiarity with other evidence or understanding of SSA's policies. *Id.* at §§ 404.1520c(c)(3)–(5), 416.920c(c)(3)–(5). At bottom, an ALJ must evaluate a medical opinion on its own merits, and the ALJ's evaluation must be supported by substantial evidence. To pass muster under the substantial evidence standard, the ALJ must compose a "narrative discussion" identifying the evidence that supports each conclusion within his decision. SSR 96-8p, 1996 WL 374184, at *7; *Butler*, 353 F.3d at 1000. The narrative must permit the reviewing court to construct a "logical bridge" connecting the ALJ's conclusions to the evidence of record. *Lane-Rauth*, 437 F. Supp. 2d at 67.

Here, the Court is persuaded that the ALJ properly analyzed the supportability and consistency of Dr. Carlson's limitations based on substantial evidence in the record. To start, the ALJ provided a reasoned explanation for why he found Dr. Carlson's decision lacked supportability. For instance, the ALJ noted that, despite Dr. Carlson's severe recommended limitations on standing and walking and the need to recline, Dr. Carlson's physical examinations of Plaintiff revealed "generally good range of motion and strength in all extremities, intact dexterity, normal gait, and no evidence of edema or effusion" and "have only revealed some pain and limited range of motion." ECF No. 7-2 at 35–36 (citing Exhibits 1F, 2F, 3F, 6F, 22F, 26F, 29F, and 30F). Similarly, with respect to Dr. Carlson's evaluation of Plaintiff's mental health, the ALJ noted it was based on relatively weak evidence: Plaintiff's "self-report and [Dr. Carlson's] limited observation of the claimant." *Id.* at 36 (citing Exhibit 28F). Elsewhere in her opinion, the ALJ also noted Dr. Carlson's observation that Plaintiff "was not on any mental health medication," and that, while Plaintiff's "objective examination [by Dr. Carlson] showed some report of restless movements, fast speech, and difficulty staying on topic," it also "noted [Plaintiff] to be easily

redirectable and [that she] was able to address specific questions with reminders." *Id.* at 35 (citing Exhibit 26F).

Moreover, the ALJ adequately explained the inconsistencies with other evidence in the record that led her to reject Dr. Carlson's opinion. She noted that "the progress notes from [Plaintiff's] primary care physician do not show any support for [Dr. Carlson's recommendations regarding Plaintiff's] need to recline or such extreme limitations in her ability to stand and walk." *Id.* at 35. The ALJ also noted that Plaintiff's lack of need for emergency care, hospitalization, and lack of follow up on mental health treatment were inconsistent with Dr. Carlson's conclusions about the severity of Plaintiff's mental health symptoms. *Id.* at 36. And the ALJ considered the relationship between Plaintiff and Dr. Carlson, noting that Dr. Carlson "was a colleague of the claimant's primary care physician and had reviewed her treatment notes and met with the claimant starting only that same month." *Id.* at 35. Together, that analysis is sufficient to explain the ALJ's refusal to adopt Dr. Carlson's more extreme limitations.

Seeking to avoid that result, Plaintiff challenges the ALJ's reasoning at virtually every turn. None of those challenges has merit. First, Plaintiff claims that the ALJ's reliance on Dr. Carlson's limited observation of Plaintiff is "contradicted by [the ALJ] later finding" persuasive other witnesses who had not examined Plaintiff at all. ECF No. 9 at 15. Had this been the only fact on which the ALJ relied, then Plaintiff might have a point. But as the above summary of the ALJ's reasoning should make clear, her consideration of Dr. Carlson's relationship with Plaintiff was only one of many factors counseling against adopting Dr. Carlson's recommendation. The ALJ gave top billing to facts undercutting the supportability and consistency of Dr. Carlson's opinion. That treatment comports with SSA rules that define supportability and consistency as "the most important factors," but provide that ALJs "may, but are not required to," consider other factors,

such as the "[l]ength of the treatment relationship" and the "[e]xtent of the treatment relationship." 20 CFR §§ 404.1520c(b)(2), (c)(3), 416.920c(b)(2), (c)(3). Put simply, the ALJ provided a sufficient explanation for finding Dr. Carlson unpersuasive, even though Dr. Carlson examined Plaintiff.

Relying on two Social Security Rulings, Plaintiff next claims that the ALJ erroneously based her decision finding Dr. Carlson's opinions unpersuasive on Plaintiff's noncompliance with treatment because she "failed to show where Plaintiff's treatment providers recommended specific treatment and how treatment would be expected to restore [Plaintiff's] ability to engage in substantial gainful activity." ECF No. 9 at 15–16 (citing SSR 18-3p; SSR 16-3p). Plaintiff misreads those Rulings. Neither apply to an ALJ's evaluation of a medical source opinion. SSR 18-3p stipulates that SSA will "only perform" the more particularized "failure to follow prescribed treatment analysis discussed in [SSR 18-3p] after [the SSA] find[s] that an individual is entitled to disability . . ., regardless of whether the individual followed the prescribed treatment." SSR 18-3p, 2018 WL 4945641, at *3 (S.S.A. Oct. 2, 2018). That was not the situation here—that is, the ALJ did not initially find the Plaintiff disabled and then retract that finding because she failed to comply with prescribed treatment. Rather, the ALJ permissibly relied on record evidence that Plaintiff failed to follow up with treatment as one factor to evaluate the weight of the evidence— that is, Dr. Carlson's conclusions about the severity of Plaintiff's mental health impairments. ECF No. 7-2 at 36; *see Annette P. v. Comm'r Soc. Sec. Admin.*, No. 21-cv-2798, 2022 WL 4560495, at *3 (D. Md. Sept 29, 2022) (finding the requirements of SSR 18-3p inapplicable because the ALJ did not initially find the claimant disabled and permitting the ALJ to consider failure to comply with prescribed treatment as a factor in discounting a medical opinion). Similarly misplaced is Plaintiff's reliance on SSR 16-3p. ECF No. 9 at 15–16 (citing SSR 16-3p). It provides guidance

on how the SSA considers a claimant's failure to follow treatment when evaluating the claimant's own testimony regarding their symptoms, not on an ALJ's assessment of the consistency of a medical opinion with other record evidence.  SSR 16-3p, 2016 WL 1119029, at *2.   In any event, the ALJ did in fact provide the explanation that Plaintiff claims is missing.  The ALJ noted that Plaintiff: (1) "reported mental health symptoms to her treating physicians on a regular basis," (2) "that she was recommended to follow-up with a formal mental health practitioner," (3) that "the record does not contain any evidence of any follow-up treatment," and (4) that Plaintiff "was not on any mental health medication."  ECF No. 7-2 at 35.  That reasoning is sufficient even under the rules Plaintiff incorrectly invokes.

Plaintiff also takes issue with the ALJ's reliance on Plaintiff's lack of hospitalization, noting that "Plaintiff did not need to be psychiatrically hospitalized in order to show mental dysfunction."  ECF No. 9 at 16.  Although it is true that hospitalization or inpatient care is not required for a disability finding, courts may consider "'a pattern of conservative medical treatment,' such as mental health treatment 'with medication and therapy' but not 'in-patient or hospitalization care.'"  *Thomas v. Comm'r of Soc. Sec. Admin.*, 479 F. Supp. 3d 66, 89 (S.D.N.Y. 2020) (citation modified) (quoting *Reyna v. Comm'r of Soc. Sec.*, No. 18-cv-636, 2019 WL 4415142, at *6 (W.D.N.Y. Sep. 16, 2019)).  So the ALJ appropriately relied on Plaintiff's lack of emergency room visits and inpatient hospitalizations as one factor that undercut Dr. Carlson's opinion of "extreme" and "marked" limitations.  And more fundamentally, the ALJ's single sentence concerning Plaintiff's lack of emergency room visits and inpatient hospitalizations followed a lengthy discussion of the findings from Dr. Carlson's examination and included references to multiple exhibits containing medical records across the different doctors.  *See* ECF No. 7-2 at 35–36.  Thus, even if the lack of hospitalization did not support the ALJ's conclusion,

the ALJ still offered sufficient reasoning to discount Dr. Carlson's opinions based on other evidence.

Finally, Plaintiff accuses the ALJ of ignoring evidence that supported Dr. Carlson's opinion, including "Plaintiff's abnormal mental status examination results," and of "cherry-pick[ing]" evidence that supported the ALJ's conclusion.  ECF No. 9 at 16.  But the ALJ did not ignore Dr. Carlson's findings that support a more restrictive RFC.  The ALJ noted that Dr. Carlson opined that Plaintiff would require unscheduled breaks and be unable to complete a typical workday and workweek.  *See* ECF No. 7-2 at 35.  The ALJ also recognized that Plaintiff often reported mental health symptoms to her treating physician.  *See id*.  The ALJ observed that while Plaintiff was not on any mental health medication, Dr. Carlson's examination showed "restless movements, fast speech, and difficulty staying on topic" and that Plaintiff was "easily redirectable."  *Id*.  And most importantly, as explained above, the ALJ explained why other evidence undercut the evidence on which Plaintiff now relies.  In short, the ALJ did not ignore Plaintiff's mental health claims, including her regular mental health symptom reports to her physicians.  Rather, the ALJ weighed them against the other evidence in the record, including Plaintiff's lack of follow up with mental health care, lack of emergency mental health care, and Dr. Carlson's own concession that her opinion on Plaintiff's mental health was limited to her self-report and Dr. Carlson's limited observation of her.  *See id.* at 35–36.

In sum, the Court finds that the ALJ provided a sufficient explanation based on substantial evidence for rejecting Dr. Carlson's recommendations.

### 2. *Nurse Ware*

Plaintiff also claims that the ALJ erred by rejecting the limitations recommended by Nurse Ware.  Nurse Ware opined that Plaintiff was limited "to a range of the sedentary exertional level,

with sitting limited to 20 minutes to one hour, standing limited to 40 minutes to one hour, walking limited to 30 minutes to one hour, frequent handling, fingering, and feeling on the right, occasional reaching, pushing, and pulling on the right, [and] never reaching on the left," among other restrictions. *Id.* at 36. The ALJ concluded that the record "does not show any medically determinable impairment that would support such extreme limitations." *Id.* The Commissioner responds that the ALJ properly considered supportability and consistency factors in finding Nurse Ware's "extreme assessment" not persuasive. ECF No. 15 at 25.

The ALJ here, too, provided a sufficient explanation for finding Nurse Ware's opinion unpersuasive based on its supportability and consistency. To begin, the ALJ explained the lack of support for Nurse Ware's recommended limitations. As the ALJ noted, physical examinations of Plaintiff "only revealed some pain and limited range of motion," which the ALJ concluded "does not support" the "extreme limitations" recommended by Nurse Ware. ECF No. 7-2 at 36. While the ALJ could have been clearer in her analysis, she properly evaluated the objective evidence provided by Nurse Ware through the citations to Exhibit 30F, Nurse Ware's examination notes. *See* ECF No. 7-2 at 31, 34–37 (citing ECF No. 7-9 at 119, 136). Exhibit 30F contains a plethora of normal physical findings and emphasizes Plaintiff's "increased need for psychiatric evaluation." ECF No. 7-9 at 122. The ALJ discussed and cited the evidence Nurse Ware relied on to support the ALJ's reasoning. The ALJ properly considered the objective medical evidence and supporting explanations presented by Nurse Ware through the ALJ's citations to the record and corresponding analysis.

The ALJ also properly articulated the lack of consistency between Nurse Ware's opinion and other evidence in the record. The ALJ noted that the record "does not show any medical determinable impairment that would support such extreme limitations" as those recommended by

Nurse Ware.   ECF No. 7-2 at 36.   As the ALJ explained, for instance, Plaintiff's physical examinations only show "some pain and limited range of motion."   *Id.*   And it is clear from the ALJ's opinion that Nurse Ware's extreme limitations were inconsistent with a plethora of other findings, including: (1) the progress notes from Plaintiff's primary care physician, (2) Dr. Colon's findings, (3) Dr. Carlson's findings of a "generally good range of motion and strength in all extremities, intact dexterity, normal gait, and no evidence of edema or effusion," (4) Plaintiff's "generally normal" diagnostic studies, and (5) Plaintiff's history of "only some occasional outpatient treatment for her musculoskeletal pain and fatigue."   *Id.* at 34–37.

In short, although the ALJ's opinion on this issue may not be a paragon of clarity, the Court can identify the ALJ's reasoning based on the opinion as a whole.   *See Wonzell C. v. O'Malley*, No. 22-cv-3828, 2024 WL 3738819, at *16 (D.D.C. May 8, 2024) ("An ALJ is not required to reiterate his appraisal of the evidence in making a conclusion if the basis for that conclusion is identifiable elsewhere in his opinion."), *report and recommendation adopted*, 2024 WL 3288070 (D.D.C. July 3, 2024).   Accordingly, the ALJ provided an adequate explanation for rejecting Nurse Ware's opinion.

## C.    Plaintiff's RFC

Plaintiff finally raises multiple challenges to the RFC itself.   Plaintiff chiefly claims that that although the ALJ found Dr. Colon's opinion consistent with other medical records and supported by her examination of Plaintiff, the ALJ "failed to adopt numerous crucial limitations assessed by Dr. Colon."   ECF No. 9 at 8–9.   In particular, Plaintiff argues that the ALJ erred by failing to account for Dr. Colon's finding, which the ALJ adopted, that Plaintiff "has a moderate limitation" in "concentrating, persisting[, and] maintaining pace," ECF No. 7-2 at 32.   ECF No. 9 at 9.   Plaintiff also faults the ALJ's decision for failing to include other limitations in her RFC,

claiming that the ALJ erred by not including a restriction corresponding to Plaintiff's moderate limitation in her ability to regulate emotions, control behavior, and maintain well-being and by allowing for "frequent" social interaction after finding that Plaintiff had a moderate social interaction limitation.  Plaintiff is correct that the ALJ's RFC did not properly account for Plaintiff's moderate CPP limitations.  However, Plaintiff's other contentions lack merit.

### 1.   Consistency, Persistence, and Pace

Plaintiff argues that the ALJ's RFC assessment did not properly account for her moderate limitations in concentration, persistence, and pace.  ECF No. 9 at 9–11.  The Commissioner contends that the ALJ's RFC assessment is supported by substantial evidence and properly accounted for Plaintiff's moderate CPP limitations.  ECF No. 15 at 22–23.  On this issue, the Court agrees with Plaintiff.

The CPP domain "refers to the [claimant's] abilities to focus attention on work activities and stay on-task at a sustained rate." 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.00(E)(3).  Here, the ALJ found that Plaintiff has a "moderate" CPP limitation.  ECF No. 7-2 at 32.  In SSA parlance, a "moderate" limitation means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." *Id.* § 12.00(F)(2)(c).  Though the SSA regulations do not define "fair," this Court has previously explained that "a moderate limitation" in maintaining CPP "necessarily establishes some deficit in the claimant's ability to sustain focused attention and concentration long enough to permit the timely and appropriate completion of tasks commonly found in work settings." *Demetria R. v. Kijakazi*, 2022 WL 3142376, at *14 (citations modified) (quoting *Nsiah v. Saul*, No. 19-cv-42, 2020 WL 12948519, at *14 (D.D.C. May 12, 2020), *report and recommendation adopted*, 2021 WL 372784 (D.D.C. Feb. 3, 2021)).

Since a CPP limitation can affect a claimant's ability to work, the ALJ must consider a CPP limitation when "tailor[ing] a claimant's RFC to his or her specific limitations." *Mirlin T. v. Kijakazi*, No. 20-cv-960, 2021 WL 9217635, at *10 (D.D.C. Aug. 24, 2021) (citing *Williams v. Colvin*, 134 F. Supp. 3d 358, 365 (D.D.C. 2015)), *report and recommendation adopted*, 2022 WL 3139032 (D.D.C. Aug. 5, 2022).  Many ALJs attempt to account for "moderate" CPP limitations by restricting the claimant's RFC to simple, routine, unskilled, and/or repetitive work (or some derivative of those limitations).  These attempts have received mixed reviews by federal courts. *Compare, e.g.*, *Patrice V. v. Saul*, No. 18-cv-2221, 2019 WL 3778771, at *5 (D. Md. Aug. 12, 2019) (finding that such an RFC did not, without more, sufficiently address moderate CPP limitations), *and Eichelberger v. Colvin*, No. 16-cv-3299, 2018 WL 2740018, at *2 (D. Md. Apr. 12, 2018) (similar), *with, e.g.*, *Taft W. v. Saul*, No. 19-cv-2781, 2020 WL 7074628, at *4 (D. Md. Dec. 3, 2020) (finding that limiting claimant to one to four step routine, repetitive tasks adequately addressed moderate CPP limitations), *and Stout v. Colvin*, No. 14-cv-2596, 2015 WL 7351503, at *12 (D. Md. Nov. 20, 2015) (similar).   Though the D.C. Circuit has yet to weigh in on this issue, district courts have set out principles that guide the analysis in this case.

As this Court has observed, the fact that a claimant "can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis."  *Yamise R. v. Kijakazi*, 21-cv-3059, 2023 WL 7074088, *11 (D.D.C. Oct. 25, 2023) (quoting *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019)); *see also Petty v. Colvin*, 204 F. Supp. 3d 196, 206 (D.D.C. 2016) (finding that, generally, limiting a claimant to "simple, routine, and repetitive tasks" is insufficient to address moderate CPP limitations because "the ability to perform simple tasks differs from the ability to stay on task" (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015))).  Stated differently, "someone with problems concentrating may not be able to complete a task consistently

over the course of a workday, no matter how simple it may be." *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020); *see also Johnson v. Saul*, No. 19-cv-3829, 2021 WL 411202, at *5 (D.D.C. Feb. 5, 2021) ("As numerous courts have noted, . . . the problem with finding a moderate CPP limitation by requiring 'simple, routine, and repetitive tasks' is that such a restriction, without more, does not actually address plaintiff's mental impairments because the difficulty of a task does not necessarily say anything about his ability to concentrate on it."). Limiting a claimant to simple tasks therefore may not adequately account for a moderate CPP limitation.

But the inverse is true, too. A claimant with a moderate CPP limitation may still be able to perform simple, repetitive tasks without additional restrictions. As this Court has explained, "it is decidedly not the case that 'an RFC limiting a claimant to,' for example, simple, routine, unskilled, and/or repetitive work and tasks with a limited number of steps 'can never be consistent with a moderate limitation in maintaining concentration, persistence, or pace.'" *Laura A. v. Kijakazi*, No. 21-cv-451, 2022 WL 3644810, at *11 (D.D.C. Aug. 24, 2022) (emphasis omitted) (quoting *Nsiah*, 2020 WL 12948519, at *15 n.4). And as always, when considering a claimant's CPP limitation, the ALJ must build an "accurate and logical bridge from the evidence to [his] conclusion" and explain why the claimant's ability to perform simple tasks is consistent with a moderate limitation in the ability to stay on task (i.e., concentrate and/or persist on a task). *Lane-Rauth*, 437 F. Supp. 2d at 67 (alteration in original) (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)). At bottom, then, the ALJ must account for a moderate CPP limitation, and, as always, must do so in a way that is susceptible to judicial review.

Lacking guidance from the D.C. Circuit on this issue, this Court has maintained that "'an ALJ's RFC assessment must either adequately account for this deficit or adequately explain why, notwithstanding that finding, the claimant's overall limitations do not actually affect her capacity

to sustain simple, routine, or unskilled work.'" *Yamise R.*, 2023 WL 7074088, at *11 (citation modified) (quoting *Demetria R.*, 2022 WL 3142376, at *14). This Court has therefore held that an ALJ may address a moderate CPP limitation by either (1) "including additional limitations in the RFC relevant to the CPP domain beyond an unadorned simple, routine, unskilled and/or repetitive tasks (or its equivalent) restriction, or (2) adequately explaining why, notwithstanding the moderate CPP limitation, the plaintiff's overall limitations do not affect his or her capacity to sustain simple, routine, unskilled and/or repetitive work." *Shea M. v. Kijakazi*, No. 21-cv-2204, 2023 WL 3040602, at *18 (D.D.C. Apr. 21, 2023) (citation modified) (quoting *Terri D. v. Berryhill*, No. 17-cv-11, 2018 WL 4688740, at *8 (W.D. Va. Sep. 28, 2018)).

Here, the ALJ did neither. Instead, the ALJ did exactly what this Court has previously held is insufficient: limited Plaintiff to the performance of "simple, routine tasks, and simple decisions; frequent interaction with supervisors, co-workers, and the public; and few changes to work processes and settings," ECF No. 7-2 at 33, without explaining how those limitations account for Plaintiff's CPP limitation. *See Yamise*, 2023 WL 7074088, at *11.

None of the limitations imposed by the ALJ adequately accounts for Plaintiff's moderate CPP limitation. To start, the restriction to "simple, routine tasks, and simple decisions" is substantially the same as other RFC restrictions that this Court has found inadequate—without further explanation by the ALJ—to address a moderate CPP limitation. *See Yamise R.*, 2023 WL 7074088, at *11 (rejecting an RFC limiting claimant to "jobs that have only simple tasks, decisions, and instructions, not performed in a fast-paced production environment," as insufficient); *Demetria R.*, 2022 WL 3142376, at *14 (finding that limiting the claimant "to perform simple, unskilled (SVP 1 or 2) sedentary work" did not adequately account for her moderate CPP limitation); *Nsiah*, 2021 WL 372784, at *15 (concluding that an RFC restricting claimant to

"simple, routine, unskilled tasks; occasional changes in a routine work setting; and occasional interaction with the public, co-workers, and supervisors" did not adequately account for plaintiff's moderate CPP limitation); *Mirlin T.*, 2021 WL 9217635, at *10 (finding that the "ALJ's limitations of 'simple work, without fast pace or strict production quotas" did not adequately address plaintiff's moderate CPP limitation). To be sure, this Court has recognized that a restriction to "simple 1–4 step, routine, repetitive tasks" can form part of a permissible RFC. *See Teresa D. v. Bisignano*, No. 24-cv-2864, 2025 WL 2255216, at *11 (D.D.C. Aug. 7, 2025) (collecting cases). But this Court has emphasized "that such a limitation is materially different than a limitation to 'simple, routine, and repetitive tasks' because the limit on the steps 'necessarily narrows the universe of tasks and jobs Plaintiff can perform to a small subset that demand reduced attention and concentration.'" *Id.* (quoting *Laura A.*, 2022 WL 3644810, at *12). Similarly, although this Court has upheld RFCs that restrict the claimant to "only occasional decision making," *id.*, such a limitation is distinguishable from a restriction to "simple decisions" because the fact that a claimant can make simple decisions "says nothing about whether the individual can do so on a sustained basis," *Yamise R.*, 2023 WL 7074088, at *11. Accordingly, that limitation is not sufficient to account for Plaintiff's CPP limitation.

Nor does restricting Plaintiff to "frequent interaction with supervisors, co-workers, and the public" suffice. Indeed, that limitation is *less* restrictive than restrictions that this Court has found fail to account for a moderate CPP limitation. *See Yamise R.*, 2023 WL 7074088, at *11 (concluding that limiting the claimant to "no more than occasional" interaction with supervisors, "coworkers, or the general public" was insufficient to account for a moderate CPP limitation); *Nsiah*, 2021 WL 372784, at *15 (concluding that an RFC restricting claimant to "occasional interaction with the public, co-workers, and supervisors" did not adequately account for claimant's

moderate CPP limitations).  So that restriction does not adequately account for Plaintiff's CPP limitation, either.

Finally, limiting Plaintiff to jobs with "few changes to work processes and settings" does not save the ALJ's RFC here.  In fairness to the Commissioner, "this Court and others have held that a limitation allowing only occasional changes in the work setting helps to adequately account for moderate CPP limitations, as it eliminates 'constant distractions for an employee who struggles to concentrate and stay on task.'"  *Teresa D.*, 2025 WL 2255216, at *11 (quoting *Laura A.*, 2022 WL 3644810, at *13).  But "*helps to*" is the operative phrase there.  In other words, a restriction on workplace changes does not *on its own* save an otherwise insufficient RFC.  Thus, this Court has rejected RFCs containing similar limitations where, as here, that limitation is paired only with generic "simple task" restrictions or their equivalent.  *Compare Shea M.*, 2023 WL 3040602, at *19 (concluding that, without more, limiting claimant to no more than "gradual" "changes in work duties" was insufficient to account for a moderate CPP limitation), *and Nsiah*, 2021 WL 372784, at *15 (concluding that an RFC restricting claimant to "simple, routine, unskilled tasks; occasional changes in a routine work setting; and occasional interaction with the public, co-workers, and supervisors" did not adequately account for claimant's moderate CPP limitations), *with Teresa D.*, 2025 WL 2255216, *11 (upholding RFC limiting claimant to "occasional changes in the work setting," in addition to restricting claimant to "simple 1–4 step, routine, repetitive tasks" and "only occasional decision making").  Therefore, the Court concludes that the ALJ did not adequately account for Plaintiff's moderate CPP limitation in Plaintiff's RFC.

Nor did the ALJ "adequately explain why, notwithstanding [the] finding [that Plaintiff had a moderate CPP limitation, her] overall limitations do not [actually] affect her capacity to sustain simple, routine, or unskilled work.'"  *Demetria R.*, 2022 WL 3142376, at *14 (quoting *Nsiah*, 2020

WL 12948519, at *14); *see* also *Laura A.*, 2022 WL 3644810, at *11 ("This Court has maintained that ALJs can properly account for CPP limitations by limiting the type of work and tasks the claimant can perform—such as, for example, simple and routine tasks or work that requires a limited number of steps—if they 'explain how such an RFC is consistent with the claimant's trouble with [CPP].'" (quoting *Nsiah*, 2021 WL 372784, at *15 n.4)).   Again, an ALJ can adequately account for a moderate CPP limitation "by limiting the type of work and tasks the claimant can perform—such as, for example, simple and routine tasks or work that requires a limited number of steps." *Yamise R.*, 2023 WL 7074088, at *11.   But the ALJ must also actually explain "how such an RFC is consistent with the claimant's trouble with concentration, persistence, or pace." *Nsiah*, 2020 WL 12948519, at *15 n.4.   Here, the ALJ's opinion provides no explanation as to how, despite Plaintiff's moderate CPP limitations, Plaintiff is capable of "*sustaining* focused attention and concentration for a significant amount of time," much less the persistence and pace needed to complete a normal workday or workweek notwithstanding Plaintiff's RFC restriction to simple, low stress work.  *Mirlin T.*, 2021 WL 9217635, at *10.   To satisfy this requirement, the ALJ might have pointed to facets of Plaintiff's life where she exhibits sustained focused attention, or testimony that she is capable of doing so.  *Cf. Laura A.*, 2022 WL 3644810, at *9, *12 (denying a motion for remand where the ALJ expressly concluded that the record did not reflect a significant defect in plaintiff's concentration, relying on an examiner's report showing plaintiff had only mildly impaired attention and concentration and no limitation on her ability to understand, remember or apply simple directions and instructions and plaintiff's own concession that she had the ability to follow written and verbal instructions).   But the ALJ did not do so.   Accordingly, because the ALJ failed to include restrictions appropriate to Plaintiff's moderate CPP limitation or

to explain why such restrictions are unnecessary, the ALJ's RFC is not supported by substantial evidence.

Finally, the Commissioner advances no argument that the ALJ's failure to account for Plaintiff's moderate CPP limitations constituted harmless error.[11]  Given this Court's conclusion that Plaintiff's moderate CPP limitations were not adequately addressed by the RFC, and that the ALJ's question to the vocational expert included only the limitations outlined in the RFC, *see* ECF No. 7-2 at 89, the Court concludes that the ALJ may not have provided an accurate hypothetical question to the vocational expert.  *See Petty*, 204 F. Supp. 3d at 205 (finding that an ALJ's failure to convey accurately the claimant's limitations to the expert can serve as grounds for reversal because it "undermines the expert's testimony that a claimant can perform other work," an instrumental aspect of determining whether the claimant qualifies for disability benefits).  Accordingly, the Court will grant the Plaintiff's motion for remand on this basis.

2.  *Plaintiff's Ability to Regulate Emotions, Control Behavior, and Maintain Well-being*

Plaintiff also contends that the ALJ erred by failing to include restrictions that reflect Plaintiff's moderate limitation in her ability to regulate emotions, control behavior, and maintain well-being.  ECF No. 9 at 9.  The domain of regulating emotions, controlling behavior, and maintaining well-being in a work setting falls under the larger category of "adapting and managing oneself."  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(E)(4).  Specifically, examples of the ability to "regulate emotions, control behavior, and maintain well-being" include:

> responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance;

---

[11]  Errors of this kind have previously been considered harmless if "(1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace and that the hypothetical question given to the expert is limited to only include only unskilled work or (2) the hypothetical otherwise implicitly accounts for a claimant's limitation in concentration, persistence, and pace."  *Mirlin T.*, 2021 WL 9217635, at *11 (citation modified) (quoting *Petty*, 204 F. Supp. 3d. at 206).  The Commissioner makes no effort to apply that standard here, and the Court will not make that argument for him.

> setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

*Id.* The ALJ found that Plaintiff has a "moderate" limitation in her ability to "regulate emotions, control behavior, and maintain well-being." ECF No. 7-2 at 33. Plaintiff faults the ALJ for not including additional restrictions in her RFC to account for that finding, such as "need[ing] to be absent from work" or "need[ing] to be off task during work." ECF No. 9 at 9. The Court finds that Plaintiff's RFC sufficiently accounts for her adapting and managing limitations.

Plaintiff's RFC limiting her to simple, routine tasks, and simple work-related decisions; frequent interaction with supervisors, co-workers, and the public; and few changes to work processes and settings, sufficiently accounts for her moderate limitation in her ability to regulate emotions. For starters, other courts have found that an RFC restriction specifically relating to regulating emotions is not required if the RFC can otherwise account for the emotional regulation limitation, and that a restriction to simple, routine, and repetitive tasks sufficiently accounts for such a limitation. *See, e.g.*, *Terrence S. B. v. Comm'r of Soc. Sec.*, No. 22-CV-0380, 2024 WL 4131237, at *4 (W.D.N.Y. Sept. 10, 2024) (finding an RFC limiting the plaintiff to "simple, routine, and repetitive tasks," and "occasionally interact[ing] with supervisors and coworkers" was sufficient to account for a mild to moderate limitation in regulating emotions); *Mangual v. Comm'r of Soc. Sec.*, 600 F. Supp. 3d 313, 329 (S.D.N.Y. 2022) (finding an RFC limiting the plaintiff to "simple, routine, and repetitive tasks" was sufficient to account for a moderate limitation in regulating emotions); *see also, e.g.*, *Seth M. D. v. Comm'r of Soc. Sec.*, No. 21-cv-1116, 2024 WL 1130381, at *9 (W.D.N.Y. Mar. 15, 2024) (finding an RFC limiting plaintiff to "simple, routine, and repetitive tasks," and "occasionally interacting with supervisors, coworkers, and the public" was sufficient to account for a moderate limitation in regulating emotions); *Christina G. v. Comm'r of Soc. Sec.*, No. 22-CV-00173, 2025 WL 1371425, at *4 (W.D.N.Y. May 12, 2025) (same);

*Demeca P. v. Comm'r of Soc. Sec.*, No. 22-CV-504, 2024 WL 4505265, at *3 (W.D.N.Y. Oct. 16, 2024) (same).

While not binding, these decisions are persuasive. A moderate limitation in this area means that the claimant has a "fair" ability to engage in certain tasks, 20 C.F.R. § 404, subpt. P, App'x 1, § 12.00(F)(2)(c), including "[r]esponding to demands," "adapting to changes," "distinguishing between acceptable and unacceptable work performance," "setting realistic goals," and "making plans for [oneself] independently of others," *id.* § 12.00(E)(4). Restricting Plaintiff to simple, routine tasks and simple work-related decisions, with few changes to work processes and setting, directly corresponds to such limitations. For instance, restricting Plaintiff to few changes to work processes and setting corresponds to her diminished ability to "adapt[] to changes" in the workplace. *See id.* And restricting her to simple, routine tasks corresponds to a diminished capacity to "[r]espond[ ] to demands," "mak[e] plans for [oneself] independently," and "distinguish[ ] between acceptable and unacceptable work performance." *See id.*

Moreover, Plaintiff's RFC is stricter than that in *Mangual*, where the court found that the sole inclusion of limiting the plaintiff to "simple, routine, and repetitive tasks" was sufficient to account for a moderate limitation in regulating emotions. *Mangual*, 600 F. Supp. 3d at 329. The ALJ here additionally restricted Plaintiff to no more than "frequent interaction with supervisors, co-workers, and the public; and few changes to work processes and settings." ECF No. 7-2 at 33. In addition, the ALJ here went further than in *Mangual* by separately discussing the reasons for placing a limitation on Plaintiff's ability to regulate emotions, rather than relying on a discussion of the broader category of adapting and managing oneself. *See id.* at 32–33. The ALJ balanced Plaintiff's abilities, such as her capacity to get along with others, with her constraints, such as problems sleeping and staying on task. *See id.* at 33.

Accordingly, Plaintiff's RFC sufficiently accounts for her adapting and managing limitation.

### c.    Frequent Versus Occasional Social Interaction Limitations

Plaintiff finally challenges the ALJ's finding that Plaintiff can engage in frequent rather than occasional social interaction. The ALJ found that Plaintiff has a "moderate limitation" in her ability interact with supervisors, co-workers, and the public. ECF No. 7-2 at 32. For that reason, the ALJ restricted Plaintiff to "frequent interaction with supervisors, co-workers, and the public." *Id.* at 33. Plaintiff argues that a more restrictive accommodation was required.

In the Social Security system, mental impairments are ranked on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).[12] Here, the ALJ concluded that Plaintiff suffers from a "moderate" limitation in social interaction, meaning that her ability to engage in social interaction "is fair," which is somewhere in between "slightly limited" and "seriously limited." 20 C.F.R. §. 404, subpt. P, App'x 1, § 12.00(F)(2). One method of accounting for this type of limitation is to restrict how frequently the claimant may encounter the condition. SSA regulations provide that an ALJ can restrict a claimant to never encountering

---

[12] The Social Security Administration defines these terms as follows:

a. No limitation (or none). You are able to function in this area independently, appropriately, effectively, and on a sustained basis.

b. Mild limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

c. Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

d. Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

e. Extreme limitation. You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.

20 C.F.R. §. 404, subpt. P, App'x 1, § 12.00(F)(2).

the condition; occasionally encountering it, meaning up to one-third of the time; frequently encountering it, meaning between one-third to two-thirds of the time; or constantly encountering it, meaning two-thirds or more of the time. *See Carson v. Barnhart*, 140 F. App'x 29, 37 (10th Cir. 2005); SSR 83-10, 1983 WL 31251, at *5–6. Here, the ALJ restricted Plaintiff to "frequent" social interaction, meaning she could engage in social interaction one- to two-thirds of the time.

Though perhaps counterintuitive because of the nomenclature, as other courts have held, an ALJ's finding of "a moderate limitation [in a particular area of functioning] is not inconsistent with a finding that an individual can engage in frequent, but not constant activity" in that area. *May v. Comm'r of Soc. Sec.*, No. 17-CV-1347, 2019 WL 2717991, at *4 (W.D.N.Y. June 28, 2019) (quoting *Jennifer Lee W. v. Berryhill*, 18-CV-64, 2019 WL 1243759, at *5 (N.D.N.Y. March 18, 2019)); *accord Simmons v. Saul*, No. 18-cv-1293, 2019 WL 12251882, at *17 (D.D.C. Sep. 30, 2019), *report and recommendation adopted*, 2019 WL 12251883 (D.D.C. Oct. 22, 2019); *see also Wightman v. Comm'r of Soc. Sec.*, No. 18-CV-6295, 2019 WL 2610712, at *2 (W.D.N.Y. June 26, 2019) ("[T]he ALJ's finding that plaintiff's moderate limitation in social interaction permits him to tolerate 'frequent' contact with supervisors, coworkers and the public was not erroneous."); *Smith v. Berryhill*, No. 17-CV-305, 2017 WL 5988653, at *6 (D. Colo. Dec. 1, 2017) ("By limiting Mr. Smith to frequent interaction, as opposed to constant interaction, the ALJ accounted for Dr. Suyeishi's moderate limitation in this regard"); *Treadwell v. Colvin*, No. 13-CV-370, 2014 WL 4656852, at *11 (E.D.N.C. Sept. 17, 2014) ("The ALJ assigned each of these opinions 'some weight' and restricted Claimant to only frequent contact with the public as a result of his consideration.). That is because "frequently" is defined by SSA regulations to mean "occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, at *5–6. And restricting a claimant to exposure to the condition only one- to two-thirds of the time is an appreciable

limitation—a reduction in exposure of 33% to 66% compared to a non-limited individual—which is sufficient to account for a "fair" limitation. 20 C.F.R. §. 404, subpt. P, App'x 1, § 12.00(F)(2). Accordingly, restricting Plaintiff to frequent social interaction adequately accounted for her moderate limitation in this area.

Moreover, like in *Simmons*, the ALJ here adequately explained why Plaintiff could have frequent interactions with the others despite her moderate limitations in the area of social interaction. 2019 WL 12251882, at *16–17. In *Simmons*, the ALJ specifically assessed the plaintiff's allegations for consistency with the evidence, noting that he "shops in stores, handles his own money, and is active in his church community," leading to the conclusion that he "had no problems getting along with family, friends, neighbors, or others." *Id.* at *17. Similarly here, the ALJ relied on Plaintiff's testimony that she "had no problems getting along with other people," that her "activities of daily living were also generally good," and that she regularly requested that another person accompany her "on public transportation to go shopping due to her anxiety." ECF No. 7-2 at 32. Accordingly, the Court finds that the Plaintiff's RFC properly assessed her ability to interact with others.

*      *      *

In sum, the Court finds that substantial evidence supports the ALJ's discounting of Plaintiff's testimony regarding the intensity and persistence of her symptoms, the ALJ's rejection of the limitations recommended by Dr. Carlson and Nurse Ware, and the ALJ's incorporation of limitations based on Plaintiff's limitations in three of the four areas of mental functioning. But the Court agrees with Plaintiff that the ALJ failed to properly account for her moderate CPP limitation when determining her RFC. Accordingly, the Court reverses and remands for the ALJ to re-determine Plaintiff's RFC, taking proper account of her moderate CPP limitation.

## IV.    CONCLUSION

For the reasons stated above, the Court will enter a separate Order that Plaintiff's motion for judgment of reversal, ECF No. 9, is **GRANTED** to the extent it requests remand to the Commissioner for further administrative proceedings, Defendant's motion for judgment of affirmance, ECF No. 15, is **DENIED**, and this case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

Date:   December 22, 2025

_____

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE